IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

WALDO WIGGINS,

    Petitioner,

vs.                                    No. 06-2790-STA-cgc

TONY PARKER,

    Respondent.

_____

ORDER GRANTING IN PART AND DENYING IN PART
PETITION PURSUANT TO 28 U.S.C. § 2254
ORDER OF DISMISSAL
ORDER GRANTING LIMITED CERTIFICATE OF APPEALABILITY
AND
ORDER CERTIFYING APPEAL WOULD BE TAKEN IN GOOD FAITH

_____

On August 25, 2006, Petitioner Waldo Wiggins, Tennessee Department of Correction prisoner number 323354, an inmate at the West Tennessee State Penitentiary in Henning, Tennessee, through counsel, filed a petition pursuant to 28 U.S.C. § 2254[1]. (Docket Entry "D.E." 1.) On December 14, 2006, the Court issued an order directing Petitioner to file an in forma pauperis affidavit or pay the habeas filing fee. (D.E. 2.) On January 9, 2007, Petitioner filed an in forma pauperis affidavit. (D.E. 3) On January 23, 2007, the Court entered an order granting leave to proceed in forma

_____

[1]    The petition was not docketed until November 21, 2006.

<u>pauperis</u> and for the Respondent to file the state court record and respond to the petition. (D.E. 4.) On April 23, 2007, Respondent filed its response to the petition. (D.E. 9.) On May 14, 2007, Respondent filed portions of the state court record. (D.E. 10.)

I.   <u>STATE COURT PROCEDURAL HISTORY</u>

On October 28, 1999, the Tipton County Sheriff's Office filed a petition in juvenile court which alleged that Wiggins committed the murder of Tatrina Terry. <u>State v. Wiggins</u>, No. W2000-02766-CCA-R3-CD, 2001 WL 1690193, at *1 (Tenn. Crim. App. Dec. 14, 2001)(D.E. 10-2 at 117). Wiggins was arrested and detained in the Shelby County Detention Center pending a hearing in juvenile court on November 2, 1999. <u>Id.</u> Wiggins was further detained pending a transfer hearing on November 17, 1999, after which Defendant was placed into the custody of the Sheriff of Tipton County to be dealt with as an adult. <u>Id.</u> (<u>Id.</u> at 106-107, 113). On March 6, 2000, the Tipton County Grand Jury indicted Wiggins on one count of intentional and premeditated first degree murder. <u>Id.</u> (D.E. 10-2 at 7.) On March 9, 2000, counsel was appointed for Wiggins. (<u>Id.</u> at 10.) On March 15, 2000, counsel filed a motion for setting of bond. (<u>Id.</u> at 11-12.) On March 23, 2000, the court set bond at two hundred fifty thousand dollars ($250,000). (<u>Id.</u> at 13.) The trial was conducted from August 21-23, 2000, and the jury found Wiggins guilty of first degree murder. (<u>Id.</u> at 51.) Defendant was sentenced to life imprisonment, and the

judgment was entered on August 23, 2000. (Id. at 52.) On September 20, 2008, a motion for judgment of acquittal or a new trial was filed. (Id. at 53-55.) On October 12, 2000, the motion for new trial was heard and denied. (Id. at 57.)

On November 6, 2000, Wiggins, through counsel, filed a notice of appeal. (Id. at 74-75.) On December 14, 2001, the Tennessee Court of Criminal Appeals affirmed the conviction. State v. Wiggins, No. W2000-02766-CCA-R3-CD, 2001 WL 1690193 (Tenn. Crim. App. Dec. 14, 2001) (D.E. 10-14), perm. app. denied (Tenn. May 28, 2002) (D.E. 10-15).

On May 8, 2002, Petitioner filed a pro se petition pursuant to the then-current version of the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-201 to -222, in the Circuit Court of Tipton County. (D.E. 10-16 at 5-16.) Cyburn H. Sullivan, III was initially appointed as counsel (id. at 44-45), but he was allowed to withdraw from representation on October 31, 2002, and Frank Deslauriers was allowed to represent Wiggins (id. at 50). On December 4, 2002, Deslauriers filed a statement that he intended to rely on Wiggins' pro se petition and would not be filing an amended petition. (Id. at 53.) On November 12, 2003, Deslauriers filed a motion to withdraw. (Id. at 55.) On December 18, 2003, the State filed its response to the petition, in which it stated, "The Petition herein, upon which the attorney for the Petitioner has indicated he intends to rely without filing an

amendment thereto, is too convoluted, incoherent, and confusing to allow a specific response". (Id. at 57.) On April 22, 2004, attorney Glenwood P. Roane, Sr. filed a motion for time to file additional motions and an amended petition and noted that the day prior, he was "requested to represent" Wiggins in the post-conviction proceedings. (Id. at 63-64.) On July 20, 2004, Roane filed a petition for writ of error coram nobis. (Id. at 76-96.) An evidentiary hearing was held on August 20, 2004, and was continued until September 15, 2004. (See id. at 99; D.E. 10-17.) On September 8, 2004, Wiggins' counsel filed an amended and supplemental petition for post-conviction relief or petition for writ of error coram nobis. (D.E. 10-16 at 101-103.) On September 15, 2004, the petition for post-conviction relief/writ of error coram nobis was heard. (Id. at 112.)[2] On September 16, 2004, the post-conviction court denied relief. (Id. at 112-121.) The Tennessee Court of Criminal Appeals affirmed. Wiggins v. State, No. W2004-02397-CCA-R3-CO, 2005 WL 3059437 (Tenn. Crim. App. Nov. 10, 2005)(D.E. 10-21), perm. app. denied (Tenn. Mar. 20, 2006)(D.E. 10-26).

　　　　To assess the claims raised by Wiggins in this petition, it is necessary briefly to set forth the facts, as found by the Tennessee Court of Criminal Appeals:

---

[2]　　　　Wiggins was represented by Roane and Brett Stein at the post-conviction hearing. (Id.)

On April 13, 1999, the victim, Tatrina Terry, came home from work at 9:55 p.m. and told her mother, Wylene, that she was leaving again. She did not indicate where she was going. Before retiring for the evening at 11:00 p.m., Wylene noticed Tatrina's pajamas lying on top of her bed. When Wylene woke up at approximately 6:00 a.m. the next morning, Tatrina was not at home and the pajamas were gone. Worried, Wylene dialed "*69" and discovered that the last person to call the Terry family's home used the telephone at Defendant's residence.

Although Tatrina's departure on April 13 was unobserved, a neighbor testified at trial that he heard Tatrina's car start up between 11:15 and 11:30 p.m. Another witness, Rodriquez Dean, testified that during a telephone conversation with Tatrina between 10:30 and 12:00 p.m. on April 13, she claimed that she was going out "to meet the dude" that night. Curious, Dean asked who she was referring to, and Tatrina replied, "the baby's father."

At approximately 6:30 a.m. on the morning of April 14, 1999, John David Martin and his uncle noticed a vehicle in the field next to Gainesville Road as they drove to work. The vehicle was blue and something white was lying beside it. Martin thought the car was in the process of being stripped and that the white object was the back seat. As the two men traveled home from work at approximately 12:00 noon, they saw that the car was still in the field and stopped. Upon closer inspection, the men discovered that the white object was a body and notified the police.

Ronnie Coleman, an investigator with the Tipton County Sheriff's Office, arrived at the scene approximately fifteen minutes after Martin and his uncle telephoned. The body of the victim, Tatrina, was on the ground beside her car, which was located approximately 200 yards from Gainesville Road in the middle of a field. Tatrina's body was dressed in pajamas and sandals, and Coleman observed no signs of a struggle. No tire tracks were apparent except for those belonging to Tatrina's car and the police car. Her personal property appeared to be untouched (a cell phone and CD player were present), and the car keys were still in the ignition. Tatrina's head revealed multiple gunshot wounds, which were later determined to be the cause of death, and the presence of soot revealed that the weapon was in contact with the skin when fired. The autopsy report indicated Tatrina had

also been smothered; the presence of small hemorrhages on the eyes and lungs, along with bruising on the mouth, were consistent with a hand placed forcefully over the mouth and nostrils. Although vaginal abrasions further indicated nonconsensual or "dry sex," probably within hours of death, no bruising or defensive wounds were present on the body.

Coleman testified at trial that Defendant became a suspect when the police learned from the victim's parents that Tatrina was planning to see him on the night she was killed. Moreover, at the time of Tatrina's death, Defendant believed he was the father of the baby she was carrying and lived approximately one-half mile from where Tatrina's body was discovered, if measured in a straight line, or "as the crow flies," over the cotton fields and a fence or two. Consequently, Coleman questioned Defendant shortly after Tatrina's body was discovered. During his conversations with the police, Defendant admitted that he and Tatrina had discussed abortion but also that they had abandoned the idea. He did not appear opposed to the idea of fatherhood and claimed to have no knowledge whether Tatrina had boyfriends other than himself. (Post mortem DNA testing by the TBI crime lab revealed that Defendant was not the father of Tatrina's baby.) Defendant lived at home and was seventeen years old when Coleman questioned him. Both of his parents were present.

Defendant informed Coleman that he spoke with Tatrina one time on the evening of April 13, 1999. She wanted to come over and see him. He said, "Yeah, come on," but he claimed that she never showed up. After Defendant told him this, Coleman received this information from the BellSouth telephone company indicating that the victim called Defendant six times between 11:41 p.m. and 12:03 a.m. on the evening prior to her death. When confronted with information, Defendant initially denied speaking with the victim that many times. Later, he recanted, claiming to be uncertain regarding the number of times they talked. Coleman testified at trial that Defendant was calm and cooperative during the investigation until they confronted him with the telephone company's records, at which point he appeared "down and out" and became "evasive." During cross-examination, Coleman conceded that the telephone records indicated only that six telephone calls to Defendant were attempted by the victim, not that they were completed. In fact, only one

6

record entry showed a completed call between the victim's cell phone and the telephone at the Defendant's residence, which occurred at 12:02 a.m. in the morning of April 14, 1999 and lasted between one and two minutes.

Defendant informed Coleman that he was at home with his parents on the evening of April 13, 1999. Defendant's parents confirmed this statement, but Defendant's father, Waldo Wiggins, Sr., admitted that he and Defendant slept in rooms located at opposite ends of the house, and, thus, it was possible that once Waldo Sr. went to bed, he would not know what was going on at the other end of the house. Waldo Sr. also testified that persons other than his wife and Defendant may have stayed overnight at their home on April 13, 1999, but he could not be sure. Waldo Sr. was retired at that time, and it was not uncommon for him to start drinking alcohol at 8:00 a.m. In addition, the Wiggins' home was unlocked virtually twenty-four hours a day, seven days a week, and approximately twelve to fifteen persons, not including friends and acquaintances, entered and left at will.

When Waldo Sr. was initially questioned as to whether the family kept guns at their residence, he was untruthful according to the testimony of Jerry Dyson, an investigator with the Sheriff's Office. In fact, the entire Wiggins family was familiar with guns, and a variety of weapons-handguns, shotguns, and rifles-were kept at the house. Waldo Sr. subsequently admitted this, but stated that he did not know exactly where they were stored because his wife, Mrs. Wiggins, occasionally moved them. Thereafter, it was discovered that on April 13, 1999, the hand-guns owned by the Wiggins' family were stored in a bag-type purse in the bedroom closet. Although, technically, access to the closet was not restricted by locks anywhere in the home, only Defendant, his parents, and his sister knew the general whereabouts of the weapons, and visitors were not allowed into the closets and purses.

On April 15, 1999, Waldo Sr. consented to a search of the Wiggins' home for weapons and Mrs. Wiggins led the officers to the purse which contained the handguns. As a result of the search, the police removed a number of weapons from the residence for further examination, including two .22 caliber rifles, a .32 caliber derringer, and a .22 caliber target pistol. Subsequent testing by the Tennessee Bureau of Investigation crime

7

lab revealed small amounts of the victim's blood on the yoke and cylinder of the .22 caliber target pistol seized from the Wiggins' home, and bullet fragments removed from the victim's brain were determined to have come from the same weapon. Captain John Fletcher, also involved with the investigation, testified that the guns all appeared "oily," indicating they had probably been cleaned recently. Fletcher noted that the .22 caliber target pistol was unique in that it also smelled vaguely of burnt powder. Investigator Jerry Dyson, with the Tipton County Sheriff's Office, testified that the investigating officers showed Defendant four of the various guns seized from his home during one of their interviews with him. When Defendant saw the .22, he "stood up in his seat and backed up approximately two feet from the table, as if he was in shock." Defendant also admitted to Captain John Fletcher, also with the Tipton County Sheriff's Office, that he, his uncle, and his father were the only persons who usually fire the .22 target pistol.

Mrs. Wiggins had heard that Tatrina was expecting her son's baby. Defendant told her, "Mama, I have a baby on the way" and appeared excited, but she thought her son was joking. According to Defendant, Tatrina would often come over at night and tap on his window, wanting to come inside. He would let her into the house while everyone else was asleep and they would have sex. Mrs. Wiggins testified that on the evening of April 13, 1999, Tatrina was expected at their house. Defendant received calls from many girls, and Mrs. Wiggins preferred that the girls come to the house rather "than for him to go out in the street." When she informed Defendant of Tatrina's death the next day, April 14th, as he returned home from school, he responded, "They found her? Where she was?" Thereafter, Mrs. Wiggins accompanied Defendant to see Tatrina's family at the hospital. Defendant was quite upset, and he cried when he spoke with Tatrina's brother.

Defendant was preparing for the Mid South Golden Gloves boxing tournament during the week Tatrina was killed. At that time, Defendant was in "excellent physical shape," according to Jimmy Humphrey, his boxing coach. On April 14, 1999, Humphreys stayed the night at Defendant's home, along with two other boxers, and the next day, April 15, the team left for Little Rock, Arkansas, where Defendant performed well and competed in the finals. Humphreys reported that Defendant did not seem worried. Instead, he appeared "focused" during the entire competition.

8

During the trial, Special Agent Roger Turner with the
Tennessee Bureau of Investigation testified that his
first interview of Defendant left him with the impression
that Defendant was "deceptive," because Defendant was
untruthful regarding how many times he spoke with the
victim the night before her death. Turner conceded that
he did not interview any suspects other than Defendant
and that the TBI did not check the victim's clothing
because they did not receive this evidence. Investigator
Coleman testified that the police officers did not
confiscate Defendant's clothing for testing or submit the
residue test which was performed on Defendant's hand.
Coleman explained that results from a residue test are
not conclusive. Coleman also conceded that the
investigators discovered nothing at the crime scene which
linked Defendant to the killing, and no evidence that the
victim ever reached Defendant's home in the late evening
of April 13th. Coleman also testified that when the
police discovered that Defendant was not the father of
the victim's baby, they did not attempt to discover the
true father's identity.

Defendant did not testify during his trial.

2001 WL 1690193, at **1-4.

II.  <u>PETITIONER'S FEDERAL HABEAS CLAIMS</u>

Wiggins raises the following issues:

1. Whether Wiggins' bond was excessive and punitive (D.E. 1
   at 4-5);

2. Whether Wiggins due process rights were violated by
   the refusal to consider newly discovered evidence
   (<u>id.</u> at 5-6);

3. Whether Wiggins' Sixth Amendment right to effective
   assistance of counsel was denied by

   a.    Failure to investigate key evidence (<u>id.</u> at
         9);

   b.    Failure to request matching of DNA samples
         results (<u>id.</u> at 9-10);

      c.     Failure to request independent testing of blood samples taken from the alleged murder weapon (<u>id.</u> at 10);

      d.     Failure to move to suppress the mischaracterization of evidence in a jury instruction (<u>id.</u> at 10-11);

      e.     Failure to raise Wiggins' mental status as mitigating evidence at sentencing (<u>id.</u> at 11);

      f.     Failure to timely file a motion for new trial (<u>id.</u> at 12);

      g.     Failure to timely file a petition for writ of error coram nobis (<u>id.</u>); and

      h.     Failure to file a motion to suppress Wiggins' statements to the police (<u>id.</u> at 13-15).

4. Whether the trial court made an impermissible comment on the evidence in its jury instruction (<u>id.</u> at 15-16);

5. Whether the trial court erred in holding that Wiggins' mental capacity was not relevant (<u>id.</u> at 17);

6. Whether the murder investigation was inept (<u>id.</u> at 18-22); and

7. Whether the evidence was sufficient to support Wiggins' conviction (<u>id.</u> at 22-24).

IV.  <u>ANALYSIS OF THE MERITS</u>

A. <u>Waiver and Procedural Default</u>

Twenty-eight U.S.C. § 2254(b) states, in pertinent part:

(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

    (A) the applicant has exhausted the remedies available in the courts of the State; or

(B)     (I)    there is an absence of available State
                corrective process;   or

        (ii)   circumstances exist that render such process
               ineffective to protect the rights of the
               applicant.

(2)    An application for a writ of habeas corpus may be
       denied on the merits, notwithstanding the failure
       of the applicant to exhaust the remedies available
       in the courts of the State.

Thus, a habeas petitioner must first exhaust available state
remedies before requesting relief under § 2254.  See, e.g.,
Granberry v. Greer, 481 U.S. 129, 133-34 (1987); Rose v. Lundy, 455
U.S. 509, 519 (1982).  A petitioner has failed to exhaust his
available state remedies if he has the opportunity to raise his
claim by any available state procedure.  28 U.S.C. § 2254(c);
Preiser v. Rodriguez, 411 U.S. 475, 477, 489-90 (1973).

     To exhaust his state remedies, the petitioner must have
presented the very issue on which he seeks relief from the federal
courts to the courts of the state that he claims is wrongfully
confining him.  Picard v. Connor, 404 U.S. 270, 275-76 (1971); Rust
v. Zent, 17 F.3d 155, 160 (6th Cir. 1994).  "[A] claim for relief
in habeas corpus must include reference to a specific federal
constitutional guarantee, as well as a statement of the facts which
entitle the petitioner to relief."  Gray v. Netherland, 518 U.S.
152, 162-63 (1996).  "'[T]he substance of a federal habeas corpus
claim must first be presented to the state courts.'"  Id. at 163
(quoting Picard, 404 U.S. at 278).  A habeas petitioner does not

11

satisfy the exhaustion requirement of 28 U.S.C. § 2254(b) "by presenting the state courts only with the facts necessary to state a claim for relief." Id.

Conversely, "[i]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." Id. When a petitioner raises different factual issues under the same legal theory, he is required to present each factual claim to the highest state court in order to exhaust his state remedies. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987). He has not exhausted his state remedies if he has merely presented a particular legal theory to the courts without presenting each factual claim. Pillette, 824 F.2d at 497-98. The claims must be presented to the state courts as a matter of federal law. "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." Anderson v. Harless, 459 U.S. 4, 6 (1982); see also Duncan v. Henry, 513 U.S. 364, 366 (1995) (per curiam) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

The state court decision must rest primarily on federal law. Coleman v. Thompson, 501 U.S. 722, 734-35 (1991). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the petitioner ordinarily is barred by this procedural default from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977). However, a federal claim may be properly exhausted even if the state-court decision does not explicitly address it; it is enough that the petitioner's brief squarely presents the issue. Smith v. Digmon, 434 U.S. 332 (1978) (per curiam); see also Baldwin v. Reese, 541 U.S. 27, 30-32 (2004) (a federal habeas claim is fairly presented to a state appellate court only if that claim appears in the petitioner's brief).

When a petitioner's claims have never been actually presented to the state courts but a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted, but procedurally barred. Coleman, 501 U.S. at 752-53; Teague v. Lane, 489 U.S. 288, 297-99 (1989); Wainwright, 433 U.S. at 87-88; Rust, 17 F.3d at 160.

A petitioner confronted with either variety of procedural default must show cause for the default and that he was prejudiced in order to obtain federal court review of his claim. Teague, 489 U.S. at 297-99; Wainwright, 433 U.S. at 87-88. Cause for a

procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. <u>Coleman</u>, 501 U.S. at 752-53; <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986).

A petitioner may avoid the procedural bar, and the necessity of showing cause and prejudice, by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750. The petitioner must show that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995) (quoting <u>Murray</u>, 477 U.S. at 496). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." <u>Id.</u>

The conduct of Wiggins' post-conviction proceedings was governed by Tennessee's Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122. That act specifies types of procedural default that might bar a state court from reviewing the merits of a constitutional claim. A one-year statute of limitations governs the filing of petitions. <u>Id.</u> at § 40-30-102. The statute enunciates a standard by which state courts are to determine whether to consider the merits of post-conviction claims:

> Upon receipt of a petition in proper form, or upon receipt of an amended petition, the court shall examine the allegations of fact in the petition. If the facts alleged, taken as true, fail to show that the petitioner

14

is entitled to relief or fail to show that the claims for
relief have not been waived or previously determined, the
petition shall be dismissed. The order of dismissal shall
set forth the court's conclusions of law.

Id. at § 40-30-106(f).[3]

The Sixth Circuit has upheld the dismissal of a Tennessee
prisoner's habeas petition as barred by a procedural default caused
by failing to file within the Tennessee statute of limitations on
post-conviction relief.  Hannah v. Conley, 49 F.3d 1193, 1194-95
(6th Cir. 1995) (construing pre-1995 statute and stating "the
language of Tenn. Code Ann. § 40-30-102 is mandatory").  In this
case, the prisoner's right to file any further state post-
conviction petition is barred by the one-year statute of
limitations and, therefore, he does not have the option of
returning to state court to exhaust any claim presented in this §
2254 petition.

---

[3]    Tenn. Code Ann. § 40-30-106 continued:

(g)    A ground for relief is waived if the petitioner personally or
       through an attorney failed to present it for determination in
       any proceeding before a court of competent jurisdiction in
       which the ground could have been presented unless:

       (1)    The claim for relief is based upon a constitutional
              right not recognized as existing at the time of trial if
              either the federal or state constitution requires
              retroactive application of that right; or

       (2)    The failure to present the ground was the result of
              state action in violation of the federal or state
              constitution.

(h)    A ground for relief is previously determined if a court of
       competent jurisdiction has ruled on the merits after a full
       and fair hearing. A full and fair hearing has occurred where
       the petitioner is afforded the opportunity to call witnesses
       and otherwise present evidence, regardless of whether the
       petitioner actually introduced any evidence.

15

B. <u>Legal Standard for Merits Review</u>

The standard for reviewing a habeas petitioner's constitutional claims on the merits is stated in 28 U.S.C. § 2254(d). That section provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This Court must determine whether the state court adjudications of the claims that were decided on the merits were either "contrary to" or an "unreasonable application of" "clearly established" federal law as determined by the United States Supreme Court. This Court must determine whether the state court decision with respect to each issue was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding.

The Supreme Court has issued a series of decisions setting forth the standards for applying § 2254(d)(1).[4]  In <u>(Terry) Williams v. Taylor</u>, 529 U.S. 362, 404 (2000), the Supreme Court emphasized that the "contrary to" and "unreasonable application of"

---

[4]    By contrast, there is little case law addressing the standards for applying § 2254(d)(2).

clauses should be accorded independent meaning. A state-court decision may be found to violate the "contrary to" clause under two circumstances:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent. Accordingly, in either of these two scenarios, a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's "contrary to" clause.

Id. at 405-06 (citations omitted); see also Price v. Vincent, 538 U.S. 634, 640 (2003); Lockyer v. Andrade, 538 U.S. 63, 73 (2003); Bell v. Cone, 535 U.S. 685, 694 (2002).[5] The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406; see also id. at 407 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' test becomes a nullity.").

---

[5]    The Supreme Court has emphasized that this standard "does not require citation of our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (emphasis in original).

A federal court may grant the writ under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." <u>Cone</u>, 535 U.S. at 694; <u>see also</u> <u>Andrade</u>, 538 U.S. at 75; <u>Williams</u>, 529 U.S. at 409.[6] "[A]n unreasonable application of federal law is different from an incorrect application of federal law." <u>Williams</u>, 529 U.S. at 410.[7] "[A] federal habeas court making the

---

[6]    Although the Supreme Court in <u>Williams</u> recognized, <u>in dicta</u>, the possibility that a state-court decision could be found to violate the "unreasonable application" clause when "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," 529 U.S. at 407, the Supreme Court expressed a concern that "the classification does have some problems of precision," <u>id.</u> at 408. The <u>Williams</u> Court concluded that it was not necessary "to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1)," <u>id.</u> at 408-09, and, to date, the Supreme Court has not had occasion to revisit the issue. In <u>Yarbrough v. Alvarado</u>, 541 U.S. 652, 666 (2004), the Supreme Court further stated:

> Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law. Cf. <u>Teague v. Lane</u>, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). At the same time, the difference between applying a rule and extending it is not always clear. Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.

[7]    <u>See also</u> <u>Andrade</u>, 538 U.S. at 75 (lower court erred by equating "objectively unreasonable" with "clear error"; "These two standards, however, are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam) (holding that the lower court "did not observe this distinction [between an incorrect and an unreasonable application of federal law], but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)."); <u>Cone</u>, 535 U.S. at 698-99 ("For [a habeas petitioner] to succeed . . . , he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly."); <u>Williams</u>, 529 U.S. at 411 ("Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must
(continued...)

'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Id.</u> at 409.[8]

Section 2254(d)(1) refers to "clearly established" federal law, "as determined by the Supreme Court of the United States." This provision "expressly limits the source of law to cases decided by the United States Supreme Court." <u>Harris v. Stovall</u>, 212 F.3d 940, 944 (6th Cir. 2000). As the Sixth Circuit has explained:

> This provision marks a significant change from the previous language by referring only to law determined by the Supreme Court. A district court or court of appeals no longer can look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.

<u>Herbert v. Billy</u>, 160 F.3d 1131, 1135 (6th Cir. 1999) (citing 17A C. Wright, A. Miller & E. Cooper, <u>Federal Practice and Procedure</u> § 4261.1 (2d ed. Supp. 1998)); <u>see also</u> <u>Harris</u>, 212 F.3d at 944 ("It was error for the district court to rely on authority other than that of the Supreme Court of the United States in its analysis under § 2254(d)."). Finally, in determining whether a rule is "clearly established," a habeas court is entitled to rely on "the holdings, as opposed to the dicta, of [the Supreme] Court's

---

[7]     (...continued)
also be unreasonable.").

[8]     <u>See also</u> <u>Brown v. Payton</u>, 544 U.S. 133, 147 (2005) ("Even were we to assume the '"relevant state-court decision applied clearly established federal law erroneously or incorrectly,"' . . . there is no basis for further concluding that the application of our precedents was 'objectively unreasonable.'") (citations omitted).

decisions as of the time of the relevant state-court decision."
Williams, 529 U.S. at 412.

There is almost no case law about the standards for applying § 2254(d)(2), which permits federal courts to grant writs of habeas corpus where the state court's adjudication of a petitioner's claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." In a decision applying this standard, the Supreme Court observed that § 2254(d)(2) must be read in conjunction with 28 U.S.C. § 2254(e)(1), which provides that a state court's factual determinations are presumed to be correct unless rebutted by clear and convincing evidence. Miller-El v. Dretke, 545 U.S. 231, 240 (2005).[9] It appears that the Supreme Court has, in effect, incorporated the standards applicable to the "unreasonable application" prong of § 2254(d)(1). Rice v. Collins, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."). That is consistent with the approach taken by the Sixth Circuit, which stated, in an unpublished decision, that

a federal habeas court may not grant habeas relief under § 2254(d)(2) simply because the court disagrees with a

---

[9]   But cf. Rice v. Collins, 546 U.S. 333, 338-39 (2006) (recognizing that it is unsettled whether there are some factual disputes where § 2254(e)(1) is inapplicable).

state trial court's factual determination. Such relief may only be granted if the state court's factual determination was "objectively unreasonable" in light of the evidence presented in the state court proceedings. Moreover . . . , the state court's factual determinations are entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence.

Young v. Hofbauer, 52 F. App'x 234, 236 (6th Cir. 2002) (citing 28 U.S.C. § 2254(e)(1))[10]; see also Matthews v. Ishee, 486 F.3d 883, 889 (6th Cir. 2007); Stanley v. Lazaroff, No. 01-4340, 2003 WL 22290187, at *9 (6th Cir. Oct. 3, 2003); Jackson v. Holland, No. 01-5720, 2003 WL 22000285, at *7 (6th Cir. Aug. 21, 2003) ("Though the Supreme Court has not yet interpreted the 'unreasonable determination' clause of § 2254(d)(2), based upon the reasoning in Williams, it appears that a court may grant the writ if the state court's decision is based on an objectively unreasonable determination of the facts in light of the evidence presented during the state court proceeding.") (citing Torres v. Prunty, 223 F.3d 1103, 1107-08 (9th Cir. 2000)).

IV. ANALYSIS OF PETITIONER'S CLAIMS

A. Denial of Bond and Excessive Bond (Claim One)

Wiggins asserts that he was denied due process of law when he was detained without bail from his arrest on October 28, 1999, until March 23, 2000, after which an excessive bond was set at $250,000.00 on March 23, 2000. (D.E. 1 at 4.) The Tennessee Court

---

[10]    See also Sumner v. Mata, 449 U.S. 539, 546-47 (1981) (applying presumption of correctness to factual determinations of state appellate courts).

of Criminal Appeals set out the factual circumstances surrounding

Wiggins' arrest, initial detention, and denial of bond as follows:

> To briefly review, Defendant was taken into custody on
> October 28, 1999. After a detention hearing in juvenile
> court on November 2, 1999, Defendant was ordered detained
> pending a transfer hearing. At the transfer hearing on
> November 17, 1999, bond was denied and Defendant was
> transferred to circuit court for prosecution as an adult.
> Following a bond hearing on March 23, 2000, bond was set
> at $250,000. Defendant remained in custody until his
> trial commenced on August 23, 2000.

Wiggins, 2001 WL 1690193, at *5.  The Tennessee Court of Criminal

Appeals held:

> Thus, the juvenile court was required to set bond in this
> case, and the proper time for doing so was at the time
> Defendant's transfer was ordered.
>
> This issue is nevertheless waived because the proper
> recourse subsequent to denial of bond in juvenile court
> was for Defendant to seek relief in circuit court. See
> Tenn. Code Ann. § 40-11-144(b) (1997). He did not. In
> fact, he delayed his objection to the juvenile court's
> decision to deny bail until he filed his motion for new
> trial. It is well-settled that a defendant should take
> whatever action is reasonably available to prevent or
> nullify the harmful effect of a court's error as soon as
> possible after it occurs. See Tenn. R. App. P. 36(a). .
> . . Defendant is not entitled to relief on this issue.

Wiggins, 2001 WL 1690193, at *6.

    Further, with regard to Wiggins' claims of excessive bail,

the Tennessee Court of Criminal Appeals stated:

> Again, we observe that Defendant failed to seek relief at
> the appropriate time for raising his issue. See Tenn.
> Code Ann. § 40-11-144(b) (1997); Tenn. R. App. P. 8 and
> 36(a); State v. Melson, 638 S.W.2d 342, 358 (Tenn. 1982)
> (defendant's only effective remedy for setting of bail at
> $200,000 was to follow Tenn. R. App. P. 8 promptly after
> bail was set-not to wait until after conviction when

22

appeal was of no practical effect or benefit). Thus, this issue is waived.

Id. at 7.  The Court then addressed whether it believed the bond to be punitive based on state law.  See id. at 8.

The Eighth Amendment states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  This bar is made applicable to the states by the Fourteenth Amendment.  Reynosa v. Schultz, 282 F. App'x 386, 389 (6th Cir. 2008); see also Mastrian v. Hedman, 326 F.2d 708, 711 (8th Cir. 1964)  On habeas review, the federal court will only inquire "whether the state judge's setting of bail is an abuse of discretion and is arbitrary or discriminatory in violation of the federal Constitution, or results in denial of counsel or denial of a fair trial".  39 C.J.S. *Habeas Corpus* § 200 (2009); see Seymour v. Money, No. 92-4305, 1993 WL 210686, at *1 (6th Cir. June 15, 1993)("Seymour's claim that the trial court set her bail at an excessive amount was properly dismissed because she has not established that the state judge acted arbitrarily in setting her bail."); see also Bonarrigo v. Janesz, No. 85-3411, 1986 WL 17272, at *2 (6th Cir. July 7, 1986)(excessive bond claim lacks merit because petitioner did not contest the bond prior to trial and petition failed to demonstrate that the "allegedly excessive amount of bail . . . rose to a level of a constitutional violation"); see also Mastrian, 326 F.2d at 711 (In 1964, $100,000 bail on a first-

degree murder charge was not necessarily arbitrary or discriminatory.).

Where a petitioner applies for federal habeas corpus relief because of state court action in denying bail or in fixing excessive bail, he must exhaust available state remedies. Atkins v. State of Mich., 644 F.2d 543, 549 (6th Cir. 1981). The question of reasonableness of bail is waived or will be considered moot where a habeas corpus petitioner waits until after conviction and sentence in a state court before applying for federal relief. Smith v. Warden, Md. House of Correction, 280 F. Supp. 827 (D. Md. 1968); see also State v. Meeks, No. M2008-00556-CCA-R3-CD, 2009 WL 1748927, at *10 (Tenn. Crim. App. June 22, 2009)("Even if the trial court had set an excessive bond, the matter became moot upon Appellant's conviction.").

Wiggins has clearly not exhausted his state remedies. A petitioner has failed to exhaust his available state remedies if he has the opportunity to raise his claim by any available state procedure. Preiser, 411 U.S. at 494-95. Moreover, to exhaust these state remedies, the applicant must have presented the very issue on which he seeks relief from the federal courts to the courts of the state that he claims is wrongfully confining him. Picard v. Connor, 404 U.S. 270, 275-76 (1971).

Wiggins had the opportunity to seek review of the judge's initial denial of bond and the subsequent allegedly excessive bond

24

amount in the state's criminal courts, to appeal that court's determination to the state court of criminal appeals, and to seek permission to appeal to the Tennessee Supreme Court. Wiggins did not seek review of the bond issues until after his conviction, and the Tennessee Court of Criminal Appeals deemed these issues waived. Wiggins has not demonstrated cause and prejudice for his failure to exhaust his state court remedies or that manifest injustice would result from the failure to review this claim.

The first issue is procedurally defaulted and DISMISSED.

B. <u>Due Process Violation - Newly discovered evidence (Claim Two)</u>

Wiggins asserts that the newly discovered evidence of blood and other evidence sampling, expert evidence regarding the testing of the firearms, and new witnesses would have affected the outcome of his trial to the degree that his due process rights were violated. (D.E. 1 at 5-8.) Wiggins raised these issues in his petition for a writ of error coram nobis. (<u>See</u> D.E. 10-16 at 76-81.) However, the state courts denied relief on the basis of independent and adequate state-law grounds, including the statute of limitations and the limited grounds for relief available under Tenn. Code Ann. § 40-26-105. <u>Wiggins</u>, 2005 WL 3059437, at *5-6. As no means remain by which Wiggins can raise these issues in state court, they are deemed exhausted but procedurally barred. The second issue is DISMISSED.

C. <u>Ineffective Assistance of Counsel (Claim Three)</u>

In the post-conviction proceedings, the Tennessee Court of Criminal Appeals noted that Wiggins argued that counsel was ineffective for failure to have the blood evidence from the gun independently tested, for failure to move to suppress his statements to police, for failure to object to the trial court's jury instruction on "admissions by the petitioner", for failure to object when the State asserted at trial that the bullets recovered from the victim matched the murder weapon, for failure to present evidence of Wiggins' mental deficiency to dispute the *mens rea* of the charged offense or to show that Wiggins might be guilty of a lesser offense, and for failure to present the testimony of Kathy Tipton, Pamela Tipton, and Crystal Shanta Weathers. <u>Wiggins</u>, 2005 WL 3059437, at **8-9. The Tennessee Court of Criminal Appeals applied the standard in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) to the various ineffective assistance of counsel issues presented to the Court.

> When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." <u>Goad v. State</u>, 938 S.W.2d 363, 369 (Tenn. 1996) (citing <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn.1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable
probability is a probability sufficient to undermine
confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694,
104 S.Ct. at 2068. Moreover,

> [b]ecause a petitioner must establish both prongs
> of the test, a failure to prove either deficiency
> or prejudice provides a sufficient basis to deny
> relief on the ineffective assistance claim.
> Indeed, a court need not address the components in
> any particular order or even address both if the
> [petitioner] makes an insufficient showing of one
> component.

<u>Goad</u>, 938 S.W.2d at 370 (citing <u>Strickland</u>, 466 U.S. at
697, 104 S.Ct. at 2069). . . .

A claim that ineffective assistance of counsel has deprived

a habeas petitioner of his Sixth Amendment right to counsel is

controlled by the standards stated in <u>Strickland v. Washington</u>, 466

U.S. 668, 687 (1984). Pursuant to <u>Strickland</u>, 466 U.S. at 887:

> A convicted defendant's claim that counsel's
> assistance was so defective as to require reversal of a
> conviction or death sentence has two components. First,
> the defendant must show that counsel's performance was
> deficient. This requires showing that counsel made errors
> so serious that counsel was not functioning as the
> "counsel" guaranteed the defendant by the Sixth
> Amendment. Second, the deficient performance prejudiced
> the defense. This requires showing that counsel's errors
> were so serious as to deprive the defendant of a fair
> trial, a trial whose result is reliable. Unless a
> defendant makes both showings, it cannot be said that the
> conviction or death sentence resulted from a breakdown in
> the adversary process that renders the result unreliable.

To demonstrate deficient performance by counsel, a

petitioner must demonstrate that "counsel's representation fell

below an objective standard of reasonableness." <u>Id.</u> at 688.

> Judicial scrutiny of counsel's performance must be
> highly deferential. It is all too tempting for a

27

> defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (citations omitted); see also Coe v. Bell, 161 F.3d 320, 342 (6th Cir. 1998) ("The specifics of what Coe claims an effective lawyer would have done for him are too voluminous to detail here. They also largely miss the point: just as (or more) important as what the lawyer missed is what he did not miss. That is, we focus on the adequacy or inadequacy of counsel's actual performance, not counsel's (hindsight) potential for improvement."); Adams v. Jago, 703 F.2d 978, 981 (6th Cir. 1983) ("a defendant 'has not been denied effective assistance by erroneous tactical decisions if, at the time, the decisions would have seemed reasonable to the competent trial attorney'").

A prisoner attacking his conviction bears the burden of establishing that he suffered some prejudice from his attorney's ineffectiveness. See Lewis v. Alexander, 11 F.3d 1349, 1352 (6th Cir. 1993); Isabel v. United States, 980 F.2d 60, 64 (1st Cir. 1992). "[A] court need not determine whether counsel's performance

was deficient before examining the prejudice suffered by the defendant." Strickland, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. See id. at 697.

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In analyzing prejudice,

> the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of the challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (citing United States v. Cronic, 466 U.S. 648, 658 (1984)); see also Strickland, 466 U.S. at 686 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). "Thus analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." Lockhart, 506 U.S. at 369.

     1.    Failure to investigate key evidence and matching of DNA samples

Wiggins asserts that his counsel failed "to take and submit for analysis residue tests and DNA sample results from the gun and the clothing, the car, the pubic hair, fetus and semen of the deceased" or even request independent testing. (D.E. 1 at 9.) Specifically, Wiggins asserts that "counsel failed to insist upon DNA testing of samples from the vagina of the deceased and matching it to semen from the Petitioner; failed to request the testing of Petitioner's clothing; failed to request that DNA tests performed on the Petitioner's hands be submitted and matched with DNA from the trigger of the gun alleged to have killed Tatrina Terry". (Id. at 9-10.)

The Tennessee Court of Criminal Appeals held:

First, we note that on appeal, the petitioner raises the following allegations of ineffective assistance:

In this case [counsel's] errors will include[:the failure to insist upon DNA testing of samples from the vagina of [the victim] and matching it with the semen from the petitioner. Failure to request the testing of petitioner's clothing, failure to request that DNA tests performed on the petitioner's hands be submitted and matched with DNA from the trigger of the gun alleged to have killed [the victim]; failure to submit to the Court the conclusions of the investigation, which proved that nothing at the crime scene linked the petitioner to the crime; and most importantly failure to inform the Court that the petitioner had not pleaded guilty contrary to a jury instruction are relevant violations of due process.

Wiggins, 2005 WL 3059437, at *7.  The Tennessee Court of Criminal Appeals held that none of these grounds for ineffective assistance of counsel were raised in the trial court, and that no proof was

presented at hearing to demonstrate that Wiggins suffered any prejudiced from these alleged errors. Id. at *8.

Wiggins does not attempt to explain why these claims should not be procedurally barred, but merely states, "This catalogue of errors, albeit inadvertent, . . . as such resulted in enormous prejudice to the Petitioner, as there was a reasonable probability that, but for the errors of Petitioner's counsel, the result of the proceeding would have been different". (D.E. 1 at 12.) Wiggins failed to exhaust these issues in the state court and failed to demonstrate cause and prejudice for his failure to exhaust these issues or that manifest injustice would result from the failure to review them. These claims are procedurally barred and DISMISSED.

> 2. Failure to request independent testing of the blood samples taken from the murder weapon

Wiggins asserts that, "It wasn't until August 20, 2004, the first day of the hearing of Petitioner's post-conviction petitions and several years after the trial, that Petitioner's post-conviction counsel requested independent testing of said blood sample taken from the alleged murder weapon". (D.E. 1 at 10.) Wiggins asserted that the Tennessee Bureau of Investigation's (TBI) DNA testing of the blood sample from the alleged murder weapon consumed the sample so that there was not enough remaining blood evidence to allow Wiggins to conduct comparison testing. (Id.; see also D.E. 10-18 at 8.) This assertion was consistent with TBI

Forensic Scientist Mike Turbeville's testimony that it was "not a big bloodstain, but it was enough for me to proceed with DNA testing" and that "the areas (on the gun) that came up positive were the front part of the cylinder . . . and the area right here underneath the barrel called the yoke." (D.E. 10-6 at 141-43.)

The Tennessee Court of Criminal Appeals held:

> The petitioner also contends that counsel was ineffective for failing to have the blood evidence from the gun independently tested. However, the petitioner admits that the sample was completely used during TBI testing. We cannot fault counsel for failing to conduct a test on evidence that no longer existed. Regardless, the petitioner has not shown that he was prejudiced by counsel's inaction or that testing of the weapon would have produced a different outcome.

Wiggins, 2005 WL 3059437, at *8.[11]

Wiggins' petition does not refer to the standards for reviewing the merits of claims raised in petitions pursuant to 28 U.S.C. § 2254 and, therefore, it is not possible to tell whether he contends that the decision of the Tennessee Court of Criminal Appeals was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). This is "a run-of-the-mill state-court decision applying the correct legal rule from [Strickland v. Washington, 466 U.S. 668, 687 (1984)] to the facts of a prisoner's case" and, therefore, it "does not fit comfortably within 2254(d)(1)'s 'contrary to' clause." Williams v.

---

[11]     Though ineffective assistance of trial counsel was addressed as an issue at the post-conviction hearing, trial counsel was not called to testify at the hearing.  See Wiggins, 2005 WL 3054937, at *4.

Taylor, 529 U.S. at 406.    In its analysis of this issue, the
state-court cited Strickland v. Washington and applied its holding
to the facts of the instant case.    See supra pp. 26-27.    Therefore,
this aspect of the decision of the Tennessee Court of Criminal
Appeals is not contrary to Strickland.

        Wiggins does not argue that the decision of the Tennessee
Court of Criminal Appeals on this issue was an unreasonable
application of Strickland.    Wiggins also does not argue that the
decision of the Tennessee Court of Criminal Appeals was an
unreasonable determination of the facts in light of the evidence
presented.    As there was no available blood evidence for comparison
testing, Defense counsel's failure to test the blood evidence from
the gun independently does not constitute deficient performance.
Wiggins' claim of ineffective assistance of counsel for failing to
independently test the blood evidence on the gun is without merit
and is DISMISSED.

        3.    Failure    to    move    to suppress
              mischaracterization of evidence by the
              Court during the jury instruction

        Wiggins asserts that the jury was given a copy of his
statements to the police and instructed that Wiggins' statement was
an admission of guilt.    (D.E. 1 at 10.)    Wiggins contends that his
trial counsel failed to object to the jury instruction or point out
to the court that Wiggins never made an admission and maintained
that he was not involved in the crime.    (Id. at 11.)    Wiggins

argues that the matter was made worse because counsel did not allow

Wiggins to take the stand to "reiterate his innocence". (Id.)

At trial, the court instructed the jury, as follows:

Evidence of an admission has been introduced in this case. An admission is an acknowledgment by the defendant of certain fact which tend, together with other facts, to establish his guilt. It must be corroborated by other independent evidence to warrant and support a conviction. The Court has permitted admission of this evidence, but it remains your duty to decide if in fact such statements were ever made. If you do not believe it was ever made you should not consider it. If you decide the statement was made, you must then judge the truth of the facts stated.

In determining whether the statement is true you should consider the circumstances under which it was made. You should also consider whether any of the other evidence before you tends to contradict the statement in whole or in part. You should not arbitrarily disregard any part of the statement but should consider all of the statement you believe is true. If you find the statement is true, you are the sole judge of the weight that you should give to it. You should consider it along with all the other evidence in the case in determining the defendant's guilt or innocence.

(D.E. 10-8 at 47-48.)

The Tennessee Court of Criminal Appeals, after reviewing

the trial court's instructions, held:

The petitioner claims that trial counsel erred in failing to object to the trial court instructing the jury on admissions by the petitioner. The petitioner argues that his statements were not admissions, and, therefore, the instruction was an impermissible commentary on the evidence. We disagree. We further fail to see any prejudice resulting from this alleged error as well.

2005 WL 3059437, at *8 (footnotes omitted).

There is no general prohibition against a trial court commenting upon the evidence. See Quercia v. United States, 289 U.S. 466, 469 (1933); see also United States v. Houston, 110 F. App'x 536, at *13 (6th Cir. 2004)("[T]he district court can explain and comment upon the evidence, as well as draw the jurors' attention to important evidence; and may express opinion upon the facts . . . ."). The Supreme Court warned that "[t]he influence of the judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.'" Starr v. United States, 153 U.S. 614, 626 (1894). In collateral proceedings, the test is "whether the errors alleged ... could have rendered [the] trial fundamentally unfair." McBee v. Grant, 763 F.2d 811, 818 (6th Cir. 1985) (quoting Buckelew v. United States, 575 F.2d 515, 518 (5th Cir. 1978)). To violate a defendant's right to a fair trial, "a trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree." Id. (quoting Daye v. Attorney General of New York, 712 F.2d 1566, 1572 (2d Cir. 1983)).

In United States v. Yates, 553 F.2d 518, 520 (6th Cir. 1977), the Government offered an exhibit to be published to the jury which had been identified as Yates' confession. The following colloquy then ensured:

> MR. BROWN (Assistant United States Attorney): Your Honor, I would request that Exhibit No. 2 be published to the

jury, however, to avoid any unnecessary time delay I
would request that it be read in open court by some
suitable person, either myself or the Clerk. THE COURT:
Mr. Dersom? MR. DERSOM (Yates' counsel): Is that as to
Exhibit 2? MR. BROWN: Yes, sir. MR. DERSOM: Your Honor,
respectfully, I submit if the exhibit is in evidence that
the jury will have time to look at it themselves. It need
not be read at this time. THE COURT: That's true, Mr.
Brown. MR. BROWN: Yes, Your Honor. THE COURT: The written
statement of the admissions or confession, or whatever
you want to call it, as made by this Defendant is in
evidence and the jury will have an opportunity to read
it, so it will not be read to or by the jury at this
time. It is clear in the record from the testimony of Mr.
Gableman and Mr. Rogers that this Defendant did admit his
participation in this bank robbery, so call your next
witness, Mr. Brown. MR. BROWN: At this time, Your Honor,
the Government rests.

Id. at 520 n. 1.  The defendant urged that the judge's remark that

the defendant admitted his participation in the bank robbery

exceeds the scope of permissible judicial comment on the evidence.

Id.  The government argued that the comment was "simply an

observation the document introduced was self-explanatory and did

not need to be published to the jury".  Id.  The Sixth Circuit

held,

Both the Supreme Court and our court have had frequent
opportunity to delineate the scope of a federal judge's
power to comment on the evidence in a criminal case. Upon
the authority of those cases, we have no hesitancy in
holding that the quoted statement of the trial judge
exceeded the scope of proper judicial comment. While the
government urges that "the jury would not have
interpreted said comment as having any bearing whatsoever
upon the veracity of the defendant, in that at the time
the comment was made, the defendant had not yet testified
. . .", it is nevertheless clear that the court's comment
struck directly at the heart of Yates' defense; it
negated Yates' claim that he did not make the confession,
that he signed the paper without realizing its contents
and that he did not rob the bank. While it is true, of

36

> course, that Yates had not yet testified at the trial, he had testified fully at the suppression hearing and thus the trial judge had to be aware of his position. Essentially Yates had no other defense.

Id. (citations omitted). The Sixth Circuit determined that "the comments affected the substantial right of the defendant to have his defense fairly heard and to have the question of his guilt or innocence decided by the jury and not by the court." Id. at 521. The case was reversed and remanded for a new trial.

There is no record evidence as to counsel's explanation for the failure to object to the jury instruction. Counsel's performance was deficient. Considering the weight of the trial judge's influence, Wiggins was prejudiced by the trial judge's characterization of Wiggins' statements to the police as an admission. The decision of the Tennessee Court of Criminal Appeals is an unreasonable application of the Supreme Court precedent in Strickland, and habeas relief is warranted.

> 4. Failure to raise Wiggins's mental status as a defense

Wiggins asserts that had his counsel made a point of his mental deficiency by introducing evidence of Wiggins' low IQ score and special education classes, the jury would have had the chance to assess his "mens rea", and this would have likely operated as a mitigating circumstance and reduced the punishment. (D.E. 1 at 11.) The issue of whether counsel was ineffective for failing to raise Wiggins' mental deficiency before the jury was raised in the

post-conviction proceedings.  (D.E. 108-18 at 8.)  At the post-conviction hearing, Wiggins offered testimony about attending special education classes (D.E. 10-17 at 41-42) and proof from the record and the bond report of Wiggins' mental deficiencies was put on the record (id. at 81; see also D.E. 10-2 at 64-65.)  The Tennessee Court of Criminal Appeals held:

> The petitioner further maintains that trial counsel erred in failing to present evidence of petitioner's mental deficiency before the jury. The petitioner contends that trial counsel should have presented proof regarding his mental deficiency to dispute the mens rea of the charged offense or to show that he might be guilty of a lesser offense. At the post-conviction hearing, the petitioner's proof consisted of his testimony that he had an IQ of 82[12] and that he attended special education classes. There is no proof regarding how the petitioner's low IQ impaired his ability to understand his rights or the interview conducted by police. Thus, the petitioner has not proven prejudice in this regard.

Wiggins, 2005 WL 3059437, at *8.

Respondent argues that Wiggins was convicted of first degree murder and received the statutory minimum sentence of life imprisonment and that Wiggins was not prejudiced because mitigation evidence would not have impacted the judgment.  (D.E. 9 at 20.) Further, to the extent Wiggins asserts that his mental capacity impacted his ability to form the mens rea for first degree murder, Respondent emphasizes that Wiggins has not presented any evidence that his low IQ or mental capacity impacted his understanding. (Id.)

---

[12]    There is record evidence that Wiggins' IQ was 68.  (D.E. 10-2 at 64.)

Wiggins' petition does not refer to the standards for reviewing the merits of claims raised in petitions pursuant to 28 U.S.C. § 2254 and, therefore, it is not possible to tell whether he contends that the decision of the Tennessee Court of Criminal Appeals was contrary to, or an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1).  This is "a run-of-the-mill state-court decision applying the correct legal rule from [Strickland v. Washington, 466 U.S. 668, 687 (1984)] to the facts of a prisoner's case" and, therefore, it "does not fit comfortably within 2254(d)(1)'s 'contrary to' clause." Williams v. Taylor, 529 U.S. at 406.  In its analysis of this issue, the state-court cited Strickland v. Washington and applied its holding to the facts of the instant case.  See supra pp. 26-27.  Therefore, this aspect of the decision of the Tennessee Court of Criminal Appeals is not contrary to Strickland.

Wiggins appears to argue that the Tennessee Court of Criminal Appeals' decision is an unreasonable application of Strickland because he asserts that had counsel presented the evidence of Wiggins' mental retardation, Wiggins may have received a reduced punishment.  (D.E. 1 at 11.)  The mere fact of mental retardation does not prevent a defendant from being found guilty of first degree murder.  See Van Tran v. State, 66 S.W.3d 790, 835 (Tenn. 2001).  However, counsel's failure to make a reasonable investigation of a defendant's mental status and present mitigating

39

evidence to the jury can constitute ineffective assistance. <u>Hodge</u> <u>v. Haeberlin</u>, No. 06-6027, 2009 WL 2836542, at *15 (6th Cir. Sept. 4, 2009). In the instant case, this Court's analysis of the issue is limited because little information regarding Wiggins' mental status was presented at the post-conviction proceedings. The Tennessee Court of Criminal Appeals' determination that there was no evidence of prejudice because there was "no proof regarding how the petitioner's low IQ impaired his ability to understand his rights or the interview conducted by police" and therefore, ineffective assistance of counsel is neither an unreasonable application of the law nor an unreasonable determination of the facts.

        This issue is without merit and is DISMISSED.

        5.    Failure to file a timely motion for new trial

        Wiggins failed to present and exhaust the issue of counsel's failure to file a timely motion for new trial in the state court and failed to demonstrate cause and prejudice or that manifest injustice would result from the Court's failure to review it. This claim is procedurally barred and DISMISSED.

        6.    Failure to timely file a petition for writ
              of error coram nobis

        Wiggins argues that his counsel failed to cite relevant authority to support his petition for writ of error coram nobis and that the petition was filed well outside of the statute of

40

limitations[13].  (D.E. 1 at 12.)  Respondent argues that Wiggins has no right to habeas relief based on 28 U.S.C. § 2254(I) and further asserts that the Tennessee Court of Criminal Appeals addressed the claims on the merits despite the untimeliness of the petition for writ of error coram nobis.  (D.E. 9 at 21.)

There is no constitutional right to the effective assistance of counsel in connection with state post-conviction petitions.  See Coleman v. Thompson, 501 U.S. 722, 752-54 ( 1991); Pennsylvania v. Finley, 481 U.S. 551, 554 (1987); see also 28 U.S.C. § 2254(I) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").  Wiggins' claim is without merit and is DISMISSED.

7.    Failure to file a motion to suppress Wiggins' statements to the police

Wiggins argues that he was not given his Miranda rights when questioned by the police on four separate occasions and that his counsel was ineffective for failing to file a motion to suppress these statements.  (D.E. 1 at 13-15.)  Wiggins argues that the police were intent to place a minor with an established learning disability at a disadvantage.  (Id. at 15.)

The Tennessee Court of Criminal Appeals noted,

---

[13]    The Court notes that the same counsel Glenwood Roane who represents Wiggins in this habeas proceeding filed the petition for writ of error coram nobis in the state court (see D.E. 116 at 76-85) and finds it unusual that an attorney would be asserting that his own performance was deficient and prejudicial without further explanation of the circumstances.

> In response to the petitioner's claim that counsel should
> have filed a motion to suppress his statement, the trial
> court found that the petitioner was a minor when his
> statements were taken but that the petitioner was always
> accompanied by a parent when he spoke with police. The
> petitioner never confessed to the crime. The court stated
> that introduction of the petitioner's statements
> "presented the contentions of the petitioner without the
> necessity of the petitioner taking the stand at trial."
> Thus, the court found that counsel was not ineffective in
> failing to move to suppress the statements.

Wiggins 2005 WL 3059437, at *4.  The Tennessee Court of Criminal

Appeals held:

> The petitioner also complains regarding counsel's failure
> to move to suppress his statements to police. The trial
> court noted that the petitioner's trial counsel "did not
> object to the statement, which presented the contentions
> of the petitioner without the necessity of the petitioner
> taking the stand at trial." As the petitioner's
> statements contain no incriminating information, and
> instead present a complete denial of any involvement in
> the crime, we fail to see what prejudice resulted from
> the statements being presented at trial.

2005 WL 3059437, at *8.

Wiggins' petition does not refer to the standards for

reviewing the merits of claims raised in petitions pursuant to 28

U.S.C. § 2254 and, therefore, it is not possible to tell whether he

contends that the decision of the Tennessee Court of Criminal

Appeals was contrary to, or an unreasonable application of, clearly

established federal law.  28 U.S.C. § 2254(d)(1).  This is "a

run-of-the-mill state-court decision applying the correct legal

rule from [Strickland v. Washington, 466 U.S. 668, 687 (1984)] to

the facts of a prisoner's case" and, therefore, it "does not fit

comfortably within 2254(d)(1)'s 'contrary to' clause." Williams v.

42

<u>Taylor</u>, 529 U.S. at 406.   In its analysis of this issue, the state-court cited <u>Strickland v. Washington</u> and applied its holding to the facts of the instant case.   See <u>supra</u> pp. 26-27.   Therefore, this aspect of the decision of the Tennessee Court of Criminal Appeals is not contrary to <u>Strickland</u>.

Though Wiggins clearly disagrees with the state court's opinion, Wiggins does not argue that the decision of the Tennessee Court of Criminal Appeals on this issue was an unreasonable application of <u>Strickland</u>.   Wiggins complains about the use of "leading questions, long period (sic) of questioning, drama, and accusatory statements during these interviews".   (D.E. 1 at 15.) Despite Wiggins' complaints about these tactics, Wiggins did not confess[14].   Wiggins has not demonstrated prejudice from the failure to file a motion to suppress, or met his burden that the Tennessee Court of Criminal Appeals' opinion is an unreasonable application of Supreme Court precedent.

Wiggins also does not argue that the decision of the Tennessee Court of Criminal Appeals was an unreasonable determination of the facts in light of the evidence presented.

Wiggins' claim of ineffective assistance for failure to file a motion to suppress is without merit and is DISMISSED.

---

[14]   The Court again notes that because post-conviction counsel did not present any evidence from trial counsel at the post-conviction hearing, there is no record evidence as to why counsel did not file a motion to suppress. Therefore, it is impossible to determine whether counsel had some strategic reason for the failure to file a motion to suppress.

D.    Impermissible comment on the evidence (Claim Four)

For the reasons stated supra pp. 33-37, regarding whether the jury instruction constituted an impermissible comment on the evidence, Wiggins is entitled to habeas relief on this claim.

E.    Trial court erred in holding that Wiggins' mental capacity was irrelevant (Claim Five)

Wiggins argues that the Tennessee Court of Criminal Appeals erred in holding that Wiggins' mental capacity was not relevant on the issue of a lesser included offense. (D.E. 1 at 17.) However, Wiggins misrepresents the state court's opinion. The state court concluded that Wiggins did not prove prejudice because there was no proof that Wiggins' low IQ impaired his ability to understand his rights or the interview conducted by police. Wiggins, 2005 WL 3059437, at *8. This claim is a restatement of Wiggins' ineffective assistance claim, and for the reasons stated supra pp. 37-40, the claim is without merit and DISMISSED.

F. Inept investigation (Claim Six)

Wiggins asserts that the investigation into this crime was inept because (1) there was no investigation to determine the biological father of the fetus though the victim was going to see the baby's father; (2) there was no investigation regarding Lamont Fayne's admission to killing the victim; (3) the investigation targeted Wiggins despite his statements that he had nothing to do with the crime; (4) the gun shot residue test was not analyzed; (5) the authorities did not investigate other individuals who may have

44

had access to the murder weapon; (6) the testing of the murder weapon was flawed and the exhibit numbers were mixed up; (7) the state conducted no further investigation into the assertions of nonconsensual sex and did not test the victim's pubic hair for a match; (8) the TBI did not test the victim's clothing; (9) law enforcement did not obtain Wiggins' clothing for testing; and (10) that evidence has been lost, destroyed or consumed by the State. (D.E. 1 at 18-22.)[15]    Respondent argues that the claim fails to assert a basis on which habeas relief can be granted. (D.E. 9 at 23.)

There is no constitutional right to a good investigation of a crime by law enforcement. Wiggins' claims related to the lack of evidence or reliable evidence is a more of a claim that the evidence presented was not sufficient to support Wiggins' conviction, see infra. pp. 45-54.

This claim is without merit and DISMISSED.

G.   Sufficiency of the evidence (Claim Seven)

Wiggins raised the issue of sufficiency of the evidence on direct appeal. The Tennessee Court of Criminal Appeals held:

---

[15]    Wiggins asserts that the murder weapon was lost or destroyed. (Id. at 20.) However, the Court indicated that the weapon was made an exhibit at trial and was in the Clerk's office as part of the evidence. (D.E. 10-17 at 29 & 82).

Wiggins also asserts that he made requests to perform DNA tests on certain evidence including the semen collected, but the State has not produced these items. (D.E. 1 at 20.) The TBI Official Serology/DNA Report indicated that no semen was present in the car and that no sperm or semen was detected on the oral, vaginal, or rectal swabs taken from the victim. (D.E. 10-2 at 90 & 95-96.)

Defendant contends that the evidence was insufficient to support a conviction for intentional and pre-meditated first degree murder or any other crime of homicide. Defendant claims that rational interpretation and/or logical and reasonable inferences from the evidence presented at trial simply cannot identify him as the perpetrator of this crime or sustain a finding of premeditation or guilt for any degree of criminal agency respecting the killing of the victim in this case. We disagree.

The proper inquiry for an appellate court determining the sufficiency of evidence to support a conviction, is whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not reweigh or reevaluate the evidence. Id.

The standard for appellate review is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Vann, 976 S.W.2d 93, 111 (Tenn. 1998). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993) (quoting State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985)). Since a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury. Id.; see also State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon

consideration of all relevant proof. <u>State v. Strickland</u>, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1995). Identity of the accused is only one element necessary to be proved, and it may be accomplished, as in this case, by circumstantial evidence. <u>State v. Thompson</u>, 519 S.W.2d 789, 793 (Tenn. 1975). Where a conviction is based upon entirely circumstantial evidence, the jury must find that the proof is not only consistent with the guilt of the accused, but inconsistent with his innocence. <u>Vann</u>, 976 S.W.2d at 112. In other words, there must be an evidentiary basis upon which the jury can exclude every other reasonable theory or hypotheses except that of guilt. <u>See</u> <u>id.</u> The proper weight to be given circumstantial evidence is a question for the jury to determine. <u>Pruitt v. State</u>, 3 Tenn. Crim. App. 256, 460 S.W.2d 385, 391 (Tenn. Crim. App.1970).

Here, when considering the evidence in a light most favorable to the prosecution, as we must, we find the circumstantial proof to be sufficient so that any rational trier of fact could have found that Defendant committed the crime beyond a reasonable doubt. First, Defendant was intimately involved with the victim, who was on her way to see him in the hours prior to her death. Second, the weapon used to kill the victim was discovered in Defendant's home less than twenty-four hours after the body was found and Defendant knew how to use it. Third, Defendant behaved suspiciously when discussing the killing with the police. He reacted strangely when confronted with the murder weapon, and he was untruthful regarding his phone calls with the victim on the evening of the crime. Finally, Defendant's response upon being told of the victim's death by his mother was indicative of his guilt. Defendant's mother testified that upon learning of the victim's death, Defendant's first remark was "They found her? Where she was?" From this statement, a jury could reasonably infer that Defendant already knew about the homicide because he committed it.

Since Defendant was convicted of first degree murder, which in this case is defined as "[a] premeditated and intentional killing of another," the jury was also required to determine that Defendant acted intentionally and with premeditation. Tenn. Code Ann. § 39-13-202(a)(1) (1997). "Premeditation" is "an act done after the exercise of reflection and judgment," and "the intent to kill must have been formed prior to the act itself."Id.

at § 39-13-202(d). It is not necessary that the intent to kill pre-exist in the mind of the defendant for any specific length of time, but "the mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." Id.

Because premeditation entails proof of a state of mind about which there may be no direct evidence, "cases have long recognized that the necessary elements of first degree murder may be shown by circumstantial evidence." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Premeditation is a question of fact to be determined by the jury. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). And, the jury may infer premeditation from the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 915 (Tenn. 1998); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our supreme court has enumerated several factors that may support the existence of premeditation and deliberation, including: (1) declarations by the defendant of an intent to kill, (2) evidence of procurement of a weapon, (3) the use of a deadly weapon upon an unarmed victim, (4) the particular cruelty of the killing, (4) infliction of multiple wounds, (5) preparation before the killing for concealment of the crime, (6) destruction or secretion of evidence of the murder, and (7) calmness immediately after the killing. State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000) (citations omitted). Although deliberation is no longer an element of first degree murder in Tennessee, the two elements were considered similar. See id.(factors used by the court were relevant to either premeditation, deliberation, or both).

Here, the evidence at trial, considered in a light most favorable to the State, presented at least five of the above factors from which the jury could infer pre-meditation. The proof indicates that Defendant procured and then used a deadly weapon on an unarmed victim. Since the murder weapon was not readily available, but stored in a purse in his parents' closet, Defendant had to purposefully locate the gun prior to shooting the victim. Tatrina was unarmed, and multiple wounds were inflicted upon her: three bullets were fired into her head at point blank range, and the autopsy revealed that she was probably also smothered during the

encounter. Next, although attempts to conceal the body were not made, the evidence indicates that Defendant attempted to clean the murder weapon and returned it to the place he initially found it within twenty-four hours. The last factor, calmness after the crime, may be inferred from the testimony concerning Defendant's behavior. The day after the killing, the proof indicates that Defendant acted relatively normal: he went to school, prepared for the upcoming boxing competition, and even wept with the victim's family. Whether or not premeditation existed is a jury question, and Defendant has not met his burden of illustrating why the evidence is insufficient to support their conclusion regarding this matter. For the above reasons, Defendant is not entitled to relief on this issue.

Wiggins, 2001 WL 1690193, at **8-11.

In Jackson v. Virginia, 443 U.S. 307, 324 (1979), the Supreme Court held that,

in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt.

This standard requires a federal district court to examine the evidence in the light most favorable to the State. Id. at 324, 326 ("a federal habeas corpus court faced with a record of conflicting facts that supports conflicting inferences must presume—even if it does not affirmatively appears in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").

Wiggins' petition does not refer to the standards for reviewing the merits of claims raised in petitions pursuant to 28

49

U.S.C. § 2254 and, therefore, it is not possible to tell whether he contends that the decision of the Tennessee Court of Criminal Appeals was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). This is "a run-of-the-mill state-court decision applying the correct legal rule from [Jackson v. Virginia, 443 U.S. 307, 324 (1979),] to the facts of a prisoner's case" and, therefore, it "does not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams v. Taylor, 529 U.S. at 406.

It is not clear whether Wiggins contends that the decision of the Tennessee Court of Criminal Appeals was an unreasonable application of Jackson v. Virginia. Although it can be inferred that Wiggins disagrees with the state-court decision, his petition does not analyze the particular deficiencies in the state-court decision in light of Jackson. The state court applied the correct legal standard to the evidence presented at trial linking Wiggins to the crime, which the jury chose to credit. See supra p. 46.

Wiggins does argue that the decision of the Tennessee Court of Criminal Appeals was based on an unreasonable determination of the facts in light of the evidence presented in state-court. 28 U.S.C. § 2254(d)(2). Wiggins asserts that "Rational interpretation and/or logical and reasonable inferences from the evidence presented at trial simply cannot identify him as the perpetrator of the crime . . . ." (D.E. 1 at 23.) Wiggins emphasizes that there

50

was no evidence that the victim ever reached his home that evening, that there was no evidence at the crime scene that linked Wiggins to the crime, and that the State's expert witness's testimony regarding the murder weapon was flawed. (Id. at 23.)

The task for this court is to determine whether it was objectively unreasonable for the Tennessee Court of Criminal Appeals to conclude that a rational trier of fact, after viewing the evidence in the light most favorable to the state, could have found that Wiggins committed the essential elements of first degree murder beyond a reasonable doubt. See Nash v. Eberlin, 258 F. App'x 761, 765 (6th Cir. 2007). Accordingly, the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by Jackson; second, deference should be given to the Tennessee Court of Criminal Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA. Tucker v. Palmer, 541 F.3d 652, 656 (6th Cir. 2008). "Where we consider the [trier-of-fact's] verdict, we do so 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" Id. (quoting Jackson, 443 U.S. at 324 n. 16).

Applying even this very deferential standard mandated by AEDPA, the Court concludes that Wiggins' conviction cannot stand. Specifically, the Court notes that there is no evidence that the victim ever got to Wiggins' house (D.E. 10-5 at 78), and no

fingerprints, DNA or other evidence that places Wiggins at the crime scene.

Wiggins is consistently characterized as acting "suspiciously", "strangely", or "untruthful". One of the main reasons that he was considered untruthful were his police statements regarding the number of times he spoke with the victim on the night of her death. However, the testimony of Bell South and Bell South Mobility representatives revealed that Wiggins was truthful about only one call being completed to his phone number. (See D.E. 10-6 at 21-22.)

Additionally, the state court focused on Wiggins' response when he found out about the victim's death. The Tennessee Court of Criminal Appeals noted that his response that "They found her?" "Where she was?" was indicative of his guilt, and that a jury could reasonably infer that he already knew about the homicide. Wiggins, 2001 WL 1690196, at *4. Further, the Tennessee Court of Criminal Appeals determined that in determining premeditation and deliberation, Wiggins' calmness after the crime could be inferred from his behavior. Id. at *10. But, the testimony at trial from Wiggins' mother fully explained his behavior in a manner that did not show calmness. Wiggins' mother testified that he told her, "Mama, take me. . . Where they at?. . . Mama, take me to the hospital.", and that he wanted to go where the family was. (D.E. 10-4 at 57-58.) They went to the hospital and saw that the family

was leaving and then went to the house. (Id. at 58.) Wiggins then called the victim's brother that evening and told him that he was sorry about his sister and he was crying in the phone. (Id.) He offered to do anything he could for the family. (Id.) Wiggins' mother was standing over him, rubbing his back while he was on the phone. (Id.)

The Tennessee Court of Criminal Appeals concluded that the weapon used to kill the victim was discovered in Wiggins' home. Id. at *9. Mike Turbeville testified that "two of the bullet fragments from Exhibit 90035220 had been fired through the barrel of Exhibit Number 90038219; that is, the .22 caliber revolver". (D.E. 10-6 at 129; see also D.E. 10-2 at 102-103.) However, the exhibit number assigned to the revolver from Wiggins' home was 90035221. (D.E. 10-6 at 141.)[16] The confusion as to whether the two bullet fragments that were lodged in the victim came from the gun at the Wiggins' home was not addressed at trial by Wiggin's counsel, however the evidence alone raises the question of whether this was the same gun.

---

[16]    The State, at the post-conviction hearing, states,

I will concede that at trial there was some — I don't think there's a recantation. I think that that is a misstatement by the TBI forensic scientist who did the ballistics. . . . But there was an exhibit number which was marked incorrectly on the lab report. Without question, what should have – the number assigned to the shell casings, I think, should have been the handgun.

(D.E. 10-17 at 85-86.) However, the State did not present new testimony from the forensic scientist to explain the discrepancy.

The Tennessee Court of Criminal Appeals also asserts as evidence of premeditation and deliberation that Wiggins procured a weapon that was not readily available to commit the murder, attempted to clean the murder weapon, and return it. Id. at *10. However, there was no evidence that Wiggins had the weapon in his possession, cleaned, or returned the weapon. There was evidence that the weapon appeared to have been cleaned, that the Wiggins' house was open twenty-four hours a day, that the Wiggins' family had daily visitors, which would have made the weapon accessible to many people who were in and out of the Wiggins' home.

The Court finds that the Tennessee Court of Criminal Appeals' decision is an unreasonable determination of the Supreme Court precedent in Jackson and an unreasonable determination of the facts. As in Newman v. Metrish, 543 F.3d 793, 797 (6th Cir. 2008), habeas relief should be granted where there is evidence that the Wiggins' family owned the gun, but no evidence placing Wiggins at the scene of the crime. For the foregoing reasons, the Court finds that Wiggins is entitled to habeas relief on his claim of sufficiency of evidence.

V.    CONCLUSION

For the reasons stated, the Court concludes that Wiggins was denied the effective assistance of counsel at trial, that the trial court erred by making an impermissible comment on the evidence that Wiggins' statement was an admission in its jury

instruction, that the evidence was insufficient, and that the state court's decision was an unreasonable application of federal law to the facts. Accordingly, the Court CONDITIONALLY GRANTS the petition for writ of habeas corpus as to these issues only. The Court DENIES the petition with regard to the remaining issues.

The State shall either release Petitioner or institute proceedings to retry him within 90 days of the filing date of this opinion. Should the State fail to do so, Petitioner may move for an unconditional writ seeking immediate release from custody. Should the State appeal this decision to the United States Court of Appeals for the Sixth Circuit, this order is stayed pending the disposition of that appeal.

VI.  <u>APPEAL RIGHTS</u>

The Court must also determine whether to issue a certificate of appealability ("COA"). The statute provides:

(1)  Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B)  the final order in a proceeding under section 2255.

(2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

55

> (3) The certificate of appealability under paragraph
> (1) shall indicate which specific issue or issues
> satisfy the showing required by paragraph (2).

28 U.S.C. § 2253(c); see also Fed. R. App. P. 22(b); Lyons v. Ohio Adult Parole Auth., 105 F.3d 1063, 1073 (6th Cir. 1997) (district judges may issue certificates of appealability). No § 2254 petitioner may appeal without this certificate.

In Slack v. McDaniel, 529 U.S. 473, 483-84 (2000), the Supreme Court stated that § 2253 is a codification of the standard announced in Barefoot v. Estelle, 463 U.S. 880, 893 (1983), which requires a showing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'" Slack, 529 U.S. at 484 (quoting Barefoot, 463 U.S. at 893 & n.4).

The Supreme Court has cautioned against undue limitations on the issuance of certificates of appealability:

> [O]ur opinion in Slack held that a COA does not require
> a showing that the appeal will succeed. Accordingly, a
> court of appeals should not decline the application of a
> COA merely because it believes the applicant will not
> demonstrate an entitlement to relief. The holding in
> Slack would mean very little if appellate review were
> denied because the prisoner did not convince a judge, or,
> for that matter, three judges, that he or she would
> prevail. It is consistent with § 2253 that a COA will
> issue in some instances where there is no certainty of
> ultimate relief. After all, when a COA is sought, the
> whole premise is that the prisoner "'has already failed
> in that endeavor.'"

Miller-El v. Cockrell, 537 U.S. 322, 337 (2003) (quoting Barefoot,

463 U.S. at 893). Thus,

> A prisoner seeking a COA must prove "'something more
> than the absence of frivolity'" or the existence of mere
> "good faith" on his or her part. . . . We do not require
> petitioners to prove, before the issuance of a COA, that
> some jurists would grant the petition for habeas corpus.
> Indeed, a claim can be debatable even though every jurist
> of reason might agree, after the COA has been granted and
> the case has received full consideration, that petitioner
> will not prevail.

Id. at 338 (quoting Barefoot, 463 U.S. at 893); see also id. at 342

(cautioning courts against conflating their analysis of the merits

with the decision about whether to issue a COA; "The question is

the debatability of the underlying constitutional claim, not the

resolution of that debate.").[17]

In this case, the Court concludes that reasonable jurists

could differ about resolving the issue of ineffective assistance of

counsel as it relates to the jury instruction, that the trial court

erred by making an impermissible comment on the evidence, and that

the evidence was insufficient to satisfy the Jackson standard.  The

Court GRANTS a limited certificate of appealability on these

issues.

Reasonable jurists could not disagree about the remaining

issues.  Therefore, the Court DENIES a certificate of appealability

for the remaining issues in the petition.

---

[17]    The Supreme Court also emphasized that "[o]ur holding should not be
misconstrued as directing that a COA always must issue." Id. at 337. Instead, the
COA requirement implements a system of "differential treatment of those appeals
deserving of attention from those that plainly do not." Id.

The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. § 1915(a)-(b), does not apply to appeals of orders denying § 2254 petitions. Kincade v. Sparkman, 117 F.3d 949, 951 (6th Cir. 1997). To appeal in forma pauperis in a habeas case, and thereby avoid the $455 appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain pauper status pursuant to Federal Rule of Appellate Procedure 24(a). Kincade, 117 F.3d at 952. Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal in forma pauperis, the prisoner must file his motion to proceed in forma pauperis in the appellate court. See Fed. R. App. P. 24(a) (4)-(5).

In this case, for the same reasons that the Court grants a limited certificate of appealability, the Court determines that any appeal would be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would be taken in good faith. If Petitioner files a notice of appeal, he must file an in forma pauperis affidavit and, if he is

58

a prisoner, an inmate trust fund account statement to establish that he is financially eligible to proceed on appeal without payment of the appellate filing fee.

IT IS SO ORDERED this 30th day of September, 2009.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE